T.C. Memo. 1999-250


UNITED STATES TAX COURT


S. ROBERT DAVIS, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 4449-92, 5744-92,        Filed July 29, 1999.
        25088-96.


<u>Michael Quigley</u>, <u>Donald C. Alexander</u>, and <u>Laura D. Byrne</u>, for
petitioner.

<u>John E. Budde</u> and <u>Joseph P. Grant</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

VASQUEZ, <u>Judge</u>: Respondent determined the following
deficiencies in and additions to petitioner's Federal income
taxes:

| Year | Deficiency | Additions to Tax | | | |
| | | Sec. 6653(b) | Sec. 6653(b)(1) | Sec. 6653(b)(2) | Sec. 6661 |
|---|---|---|---|---|---|
| 1976 | $263,353.75 | $131,676.88 | -- | -- | -- |
| 1984 | 20,255.00 | -- | $10,113 | [1] | $5,056 |
| 1985 | 244,848.00 | -- | -- | -- | -- |
| 1987 | 24,986.00 | -- | -- | -- | -- |

[1] 50 percent of the interest on $20,255.

Respondent also determined that increased interest pursuant to section 6621(d) applied to the 1976 deficiency.

By three amendments to answer for the year 1985, respondent (1) increased the deficiency by $367,776 (resulting in a total deficiency of $612,624), (2) asserted additions to tax pursuant to (a) section 6653(b)(1) in the amount of 50 percent of the underpayment, (b) section 6653(b)(2) in the amount of 50 percent of the interest payable with respect to the deficiency attributable to fraud, and (c) section 6659 in the amount of $94,950, and (3) asserted increased interest pursuant to section 6621(d).

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. After concessions, the primary issues for decision are as follows:

(1) Whether petitioner is liable for additions to tax for fraud for 1976, 1984, and 1985;

(2) whether petitioner is entitled to a net operating loss (NOL) carryback from 1988 to 1985 greater than the amount allowed by respondent; and

(3) whether petitioner is entitled to deduct certain expenses incurred in 1987.

If we decide that petitioner's tax returns for 1976, 1984, and 1985 are not fraudulent, we must decide whether the periods of limitations for these years have expired.  If we conclude that petitioner's tax returns for 1976, 1984, and 1985 are fraudulent, we must decide the following issues:

(1) The fair market value of Strata Corp. (Strata) stock for 1985;

(2) the fair market value of an 18-acre parcel of real estate located at 1450 Brown Road, Columbus, Ohio (Brown Road property), and a 274+ acre parcel of land in McKean Township, Licking County, Ohio (the Licking County property), for 1976;

(3) whether petitioner is entitled to certain depreciation deductions for 1976;

(4) whether the "Riverview" sales are capital transactions for 1985;

(5) whether petitioner is liable for interest on a substantial understatement attributable to a tax-motivated transaction for 1976 and 1985 pursuant to section 6621(d);

(6) whether petitioner is liable for the addition to tax pursuant to section 6661 for 1984; and

(7) whether petitioner is liable for the addition to tax pursuant to section 6659 for 1985.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations of facts and the attached exhibits are incorporated herein by this reference.  At the time he filed his petition in docket Nos. 4449-92 and 5744-92, petitioner (Mr. Davis) resided in Amlin, Ohio.  At the time he filed his petition in docket No. 25088-96, petitioner resided in Tampa, Florida.

Mr. Davis' Professional Activities

Mr. Davis was born on October 31, 1938, in Columbus, Ohio. In his youth, he often chauffeured his mother, a real estate agent, around Columbus in connection with her business.  Mr. Davis observed his mother attentively and learned about real estate.  As his knowledge increased, he grew anxious to enter the real estate business.  In February 1955, Mr. Davis applied for, and received, a real estate license.

Initially, Mr. Davis actively and successfully sold residential real properties.  Soon thereafter, his emphasis shifted from selling real estate to constructing, remodeling, and developing real estate.  Originally, this business operated as a sole proprietorship.  Gradually, the business expanded, and Mr.

Davis formed two corporations--one for residential construction and sales and the other for commercial development and leasing.

During the 1960's, Mr. Davis' corporation that engaged in the commercial development and leasing business was extremely successful and grew substantially. In 1965, he formed a new corporation, S. Robert Davis & Co., Inc. (Davis Co.), to conduct business as a developer and builder of real estate projects.

Since the 1960's, apart from his real estate activities, Mr. Davis has started and promoted various companies. In the 1960's, Mr. Davis acquired Kentucky Fried Chicken (KFC) franchises in Manhattan and Westchester County, New York.

In 1968, Mr. Davis and three other individuals formed National Diversified Corp. (National Diversified). Mr. Davis was elected chief executive officer (CEO). KFC was National Diversified's first national account.

In 1969, National Diversified changed its name to National Fast Food Corp. National Fast Food Corp. formed a wholly owned subsidiary named Arthur Treacher's Fish & Chips (Arthur Treacher's). Arthur Treacher's grew from an entity owning one restaurant to an entity owning more than 700 restaurants. Mr. Davis was an employee and the chairman of Arthur Treacher's.

In the early 1970's, National Fast Food Corp. changed its name to NFF Corp. In 1971, NFF Corp. purchased the stock of Lake Hamilton Citrus Co. (LHCC). LHCC owned large citrus groves in

Florida and produced citrus products. Around 1972 or 1973, NFF Corp. changed its name to Orange Co., Inc. (Orange Co.), and changed LHCC's name to Orange Co. of Florida, Inc. In 1976, Orange Co. was listed on the New York Stock Exchange. In 1978, Orange Co. sold the Arthur Treacher's chain.

By 1985, Orange Co. had revenues approximating $70 to $80 million a year. During Mr. Davis' involvement with Orange Co., it produced approximately 5 percent of the orange juice consumed in the United States.

In 1970, Mr. Davis, R. David Thomas (Dave Thomas), and Len Imke started Wendy's International, Inc. (Wendy's). Mr. Davis was a board member, adviser, and investor of Wendy's. Mr. Davis held more than 20 percent of the stock of Wendy's at its inception, and he facilitated financing for the company. He built the first freestanding building used by a Wendy's restaurant and, during the company's first year of operation, raised $1 million. Two years later, Mr. Davis raised an additional $3 million and facilitated additional financing.

In 1976, Buckeye Federal Savings & Loan (Buckeye) was contemplating a public offering. Mr. Davis decided to make a substantial investment in Buckeye. He went to separate brokerage firms and informed them that he wished to acquire their allotment of Buckeye shares. Through these firms, Mr. Davis acquired 20

percent of Buckeye's shares. Sometime thereafter, he was elected chairman of the board of Buckeye.

In 1981, Mr. Davis (and others) founded Big Bite, Inc. (Big Bite), to promote fast food franchises serving pita sandwiches. Mr. Davis was a primary investor in Big Bite. In 1983, he was elected to Big Bite's board of directors. By 1982 or 1983, Big Bite expanded to a chain of approximately 30 restaurants. In the mid-1980's, Big Bite's restaurants fell out of favor with consumers.

Mr. Davis also was instrumental in the formation and financing of other corporations traded on the national over-the-counter market. One of these corporations was Strata. Strata was in the oil and gas exploration and drilling business. Mr. Davis was the first chairman of the board of Strata and one of its three majority shareholders.

Over the years, Mr. Davis solicited investments in the various entities he promoted from a large group of potential investors. Mr Davis gave away shares he personally held in the promoted entities (1) to ensure important potential investors would be enthusiastic to invest in the next venture/entity he promoted and (2) in the hope that these investors would help Mr. Davis in his promotion of certain businesses.

Petitioner held a substantial number of shares in the entities he promoted with a zero basis in those shares. Thus, he

felt it cost him nothing to give away his shares (which he did) to potential investors or people who could refer potential investors.

In 1985, Mr. Davis resigned from all positions he held in public entities and prominent charitable organizations in which he had been involved to direct his attention to defending himself in various governmental proceedings that were underway.  Mr. Davis was under investigation by the Immigration and Naturalization Service, the Environmental Protection Agency, and the Securities and Exchange Commission (SEC).  He also was under investigation for criminal mail fraud.  The Internal Revenue Service (IRS) was conducting a "TCMP" audit, and State and city officials also were conducting income tax audits.

These various proceedings garnered Mr. Davis a lot of unfavorable local publicity on radio and television and in newspapers and magazines.  During this time, Mr. Davis' ability to generate income from the public entities he was associated with was limited.

Mr. Davis' Employees

 1.   Jean Davis

In 1964, Jean Davis began working for Mr. Davis as a secretary.[1]  In the early 1970's, her duties expanded to include

---

[1]  Jean Davis and Mr. Davis are not related.

bookkeeping. Since the early 1970's, Jean Davis has maintained Mr. Davis' books and records including his invoice, payroll, payroll tax, and real estate files.

2. <u>Kathleen Blair</u>

Kathleen Blair (Ms. Blair) worked for Strata as executive secretary for the president. In 1981, she began working for Mr. Davis. Ms. Blair had primary responsibility for maintaining books and records regarding Mr. Davis' Strata stock transactions.

<u>Mr. Garrison</u>

From 1946 until 1954, Robert Garrison's (Mr. Garrison) primary business was developing and selling real estate in Columbus, Ohio. Since the late 1950's, Mr. Garrison has been appraising real estate in Ohio, and at least 70 to 80 percent of his work was in appraising (the rest was in sales). During the years in issue, Mr. Garrison and his partner Gerald King owned the independent appraisal firm of Garrison & King (G & K).

During his career, Mr. Garrison's appraisal work has included approximately 400 eminent domain cases. He worked on only two of these cases for Mr. Davis.

During his career, Mr. Garrison has conducted numerous appraisals of Ohio properties for many large private and publicly listed companies. He also has done appraisals for the IRS.

Mr. Garrison's appraisal work for Mr. Davis, and companies connected with Mr. Davis, constituted a very small percentage (1

to 2 percent at a maximum) of Mr. Garrison's appraisal work. Other than obtaining appraisals from Mr. Garrison, Mr. Davis had no business dealings with Mr. Garrison except for the purchase of one lot of real estate more than 30 years ago.

Mr. Garrison always charged Mr. Davis the normal hourly or flat fee for appraisals. The fees were reasonable and competitive. Mr. Garrison's fee was never contingent on the outcome of an appraisal. Neither Mr. Davis nor his employees ever suggested or implied to Mr. Garrison the conclusion as to value that Mr. Davis wished the appraisal to reach. Mr. Davis never paid Mr. Garrison any compensation other than the appraisal fee.

Mr. Davis rarely spoke with Mr. Garrison. Generally, Mr. Davis' staff--usually Jean Davis--contacted and dealt with Mr. Garrison or other appraisers. Since meeting Mr. Garrison in the 1960's, Mr. Davis has met with Mr. Garrison only a few times.

Mr. Davis' Philanthropy

Mr. Davis has made many charitable contributions of stock, realty, and personalty. His gifts have included thousands of shares of Wendy's stock, a 1919 Model T Ford Four Door Touring Car, and 3 air conditioners and 23 tons of coolant.

1.   Mr. Davis' Gifts of Real Property to Charities

    a.   Brown Road Property

On or about April 21, 1971, Davis Co. purchased the Brown Road property.  In 1974, Davis Co. liquidated and distributed its assets, including the Brown Road property, to Mr. Davis.

Paul Eddy (Mr. Eddy), Mr. Davis' brother-in-law, was a founding member of, and a deacon at, the Maranatha Baptist Church (MBC).  Mr. Davis was not a member of the MBC.  During 1976, Mr. Eddy solicited a gift from Mr. Davis to the MBC.  On or about December 22, 1976, Mr. Davis donated the Brown Road property to the MBC.

In response to Mr. Eddy's solicitation of Mr. Davis' donation of the Brown Road property, the MBC's pastor (Pastor Brock) offered a tuition waiver to Mr. Eddy for his children attending a school operated by the MBC.  Mr. Eddy declined the offer because he felt that accepting it was improper for a deacon of the church.

Mr. Eddy suggested to Pastor Brock that he make the offer to Judy Mascari (Ms. Mascari) instead.  Ms. Mascari is Mr. Eddy's sister-in-law and Mr. Davis' sister.  Ms. Mascari and her family were members of the MBC, and during 1976, some of Ms. Mascari's children (Mr. Davis' nieces and nephews) attended the school operated by the MBC.  The offer was made to Ms. Mascari, and she accepted it.

Mr. Davis did not condition his gift of the Brown Road property to the MBC on the MBC's granting to Mr. Eddy or Ms. Mascari a tuition waiver. Pastor Brock never discussed this issue with Mr. Davis.

Mr. Garrison prepared an appraisal of the Brown Road property as of December 20, 1976. Mr. Davis and Mr. Garrison had no conversations regarding the Brown Road property. Neither Mr. Davis nor his employees provided G & K with any comparable sales information concerning the appraisal of the Brown Road property. The appraisal concluded that the Brown Road property's fair market value was $400,000.

On Mr. Davis' 1976 Federal income tax return (the 1976 return), Mr. Davis claimed a charitable contribution deduction in the amount of $400,000 in connection with his donation of the Brown Road property to the MBC. The donation of the Brown Road property was reported and identified on Schedule A of the 1976 return. Two additional pages concerning the donation also were attached to the 1976 return: (1) An acknowledgment letter from Pastor Brock and (2) a letter from G & K opining that the fair market value of the Brown Road property as of December 20, 1976, was $400,000. The G & K opinion letter made explicit reference to the contemporaneous appraisal report that detailed the valuation methodology, but it was not attached.

b. <u>Licking County Property</u>

On May 5, 1976, Mr. Davis purchased the Licking County property. Mr. Davis partitioned the Licking County property into four parcels: (1) A 20-acre parcel that contained buildings and fences, (2) a 220-acre parcel (the 220 acres), (3) a 12.82-acre parcel, and (4) a 21.7-acre parcel.

Since 1963, Juan Sotos (Dr. Sotos) has been a faculty member of the Ohio State University Medical School. Dr. Sotos specializes in pediatric endocrinology. Since this time, Dr. Sotos has been a doctor on the staff of Children's Hospital.

In 1977, Dr. Sotos and his family became neighbors and friends of Mr. Davis and his family.

In July or August of 1984, Arthur Krobacher (Mr. Krobacher), the president-elect of Children's Hospital's board of trustees, requested that Dr. Sotos discuss with Mr. Davis the possibility of Mr. Davis' making a donation to Children's Hospital. Mr. Krobacher approached Dr. Sotos about soliciting the donation from Mr. Davis because Mr. Krobacher was aware that Dr. Sotos and Mr. Davis were neighbors, and Mr. Davis had previously contributed to the hospital.[2]

Dr. Sotos felt uncomfortable asking Mr. Davis for a contribution; however, at a social dinner not long after his

---

[2] Mr. Davis had previously donated 10,000 to 12,000 shares of Wendy's stock and $100,000 cash.

meeting with Mr. Krobacher, he solicited a donation from Mr. Davis.  Mr. Davis immediately committed to making a donation to be dedicated to Dr. Sotos' research.  On November 14, 1985, Mr. Davis donated the 220 acres to the Children's Hospital Foundation.

Mr. Garrison prepared an appraisal (the 1985 appraisal) of the 220 acres as of May 1, 1985.  Neither Mr. Davis nor his employees provided G & K with any comparable sales information concerning the appraisal of the 220 acres.  The 1985 appraisal concluded that the fair market value of the 220 acres was $605,000.

On Mr. Davis' 1985 Federal income tax return (the 1985 return), Mr. Davis claimed a $605,000 charitable contribution deduction for the donation of the 220 acres to Children's Hospital.

The 1985 appraisal used three comparable sales to determine the fair market value of the 220 acres.  Two of the three comparable sales never occurred.

Around 1993, Mr. Garrison first learned that two comparable sales were nonexistent.  Mr. Garrison obtained this information from a "runner" at the Licking County Courthouse.  Mr. Garrison used the runner to obtain comparable sales because the real property records in Licking County were not readily available.

Sometime after the commencement of the case at bar, Mr. Davis learned of the two nonexistent comparable sales used in the 1985 appraisal.

2.   Gifts of Strata Stock

a.   Conrad Ottelin

For many years, Conrad Ottelin (Dr. Ottelin) has practiced dentistry in Columbus, Ohio.  In late 1983 or early 1984, he performed a minor adjustment to the dentures of Mr. Davis' mother.  The adjustment took only 4 to 5 minutes to perform.  Dr. Ottelin customarily performed this kind of minor service without charge as a gesture of goodwill.  Dr. Ottelin did not bill Mr. Davis or his mother for these services.

Sometime afterwards, as a gesture of thanks, Mr. Davis sent Dr. Ottelin 500 shares of Strata stock.  Dr. Ottelin believed that the stock was a gift and treated it as such.  In February 1984, Strata stock's traded price was approximately $5 per share.

b.   Ed Walker

Ed Walker (Mr. Walker) was a former professional baseball player and well-known businessman in Las Vegas, Nevada.[3]  He had many influential acquaintances.

Mr. Walker and Mr. Davis were longtime friends.  During their friendship, Mr. Walker introduced Mr. Davis to many rich

_____

[3]  Mr. Walker is deceased.

and famous people including Gene Autry, Art Linkletter, and Danny Thomas. Some of the people Mr. Walker introduced to Mr. Davis invested hundreds of thousands of dollars in companies that Mr. Davis promoted.

Mr. Walker also invested in several companies promoted by Mr. Davis including Buckeye, Big Bite, and Orange Co.

In 1984, Mr. Davis gave Mr. Walker 100,000 shares of Strata stock. Mr. Davis never received any payment for these shares.

### c. Ohio Dominican College

On January 7, 1985, Mr. Davis donated 40,000 shares of unregistered class A common stock of Strata to Ohio Dominican College (ODC). He gave ODC four stock certificates, dated November 30, 1983, each of which represented 10,000 shares. Each certificate bore a restrictive legend that set forth the following:

> THE SHARES OF CLASS A COMMON STOCK EVIDENCED BY THIS CERTIFICATE WERE SOLD WITHOUT REGISTRATION UNDER THE SECURITIES ACT OF 1933 OR ANY STATE SECURITIES LAW IN RELIANCE ON EXEMPTIONS THEREFROM. THE SHARES MAY NOT BE SOLD UNLESS REGISTERED OR EXEMPT PURSUANT TO THE SECURITIES ACT OF 1933 AND ALL APPLICABLE STATE SECURITIES

ODC acknowledged that the stock was restricted within the meaning of rule 144 of the Securities Act of 1933 and agreed not to dispose of the Strata stock in violation of rule 144.

On January 6 and 7, 1985, the bid and asked prices for registered, publicly traded Strata stock were $4.50 and $4.75, respectively.

Mr. Davis claimed a $190,000 charitable contribution deduction on the 1985 return for the donation of the Strata stock to ODC. The 1985 return fully disclosed the contribution of the Strata stock to ODC on Form 8283, Noncash Charitable Contributions. Attached to the 1985 return also were Mr. Davis' letter to the president of ODC (Sister Mary Andrew), Sister Mary Andrew's acknowledgment letter, and a certificate, signed by Sister Mary Andrew, concerning her understanding of the application of rule 144 of the Securities Act of 1933 to the donated stock.

## Mr. Davis' Legal Expenses

### 1. Squirrel Bend Litigation/Mail Fraud

From 1968 through 1985, with the exception of a 10-12 month period during 1980 and 1981, Mr. Davis resided on Squirrel Bend Road in the City of Upper Arlington, Ohio. This area is known as "Squirrel Bend".

In the spring of 1981, Mr. Davis constructed a waterline along Squirrel Bend to provide fire protection for the neighborhood. In accordance with procedures set forth by the City of Upper Arlington for construction of the waterline, Mr.

Davis built the waterline under the supervision of Harold Hyrne (Mr. Hyrne), the city manager of Upper Arlington, and his staff.

In September 1981, Mr. Davis sold 1,500 shares of Big Bite to Mr. Hyrne.

On June 12, 1985, in a four-count indictment, the United States charged Mr. Davis with violating 18 U.S.C. sections 1341 and 1342 (mail fraud). The indictment alleged that Mr. Hyrne permitted Mr. Davis to inflate the cost of the waterline in exchange for Mr. Davis' providing Mr. Hyrne a $3,000 credit for, and an opportunity to purchase, common stock in Big Bite. Mr. Davis pleaded not guilty to the charges, and eventually he was acquitted of all wrongdoing (altogether, the Squirrel Bend litigation).

2. SEC Litigation

In late 1984 or early 1985, the SEC commenced an inquiry into the unusual amount of trading of Orange Co. securities in late August 1984. This period surrounded Orange Co.'s public announcement concerning the termination of acquisition talks with potential suitors.

In February 1985, the president of Orange Co. received notice of this inquiry from the SEC. The SEC requested a chronology of events leading up to the public announcement, a list of all persons aware that the talks had been terminated before the announcement, and a description of any relationship

between Jack Binion (Mr. Binion) and Orange Co.  Orange Co. voluntarily cooperated with the SEC investigation and provided the SEC with all requested information.

In January 1986, the SEC issued a subpoena to Orange Co. requesting documents and information regarding the acquisition talks and matters related to Mr. Binion.  At the time Orange Co. received the subpoena, it was unaware of the SEC's investigation of Orange Co. securities trades of Mr. Davis' sons.

Throughout 1986 and through September 1987, Mr. Davis participated in the SEC investigation of Orange Co.  During the fall of 1987, Mr. Davis learned that the SEC was no longer investigating trading in Orange Co. securities by Mr. Binion, but instead it was focusing on transactions in Orange Co. securities by his sons.

In September 1987, the SEC filed a civil complaint (SEC complaint) against petitioner alleging violations of the Securities Act of 1933 and the Securities Exchange Act of 1934. The SEC alleged that certain trading in Orange Co. stock by Mr. Davis' sons was based on material, nonpublic information provided to them by Mr. Davis.

Mr. Davis denied all allegations of wrongdoing contained in the SEC complaint.  On February 3, 1989, the SEC complaint was dismissed with prejudice after obtaining an agreement from Mr.

Davis not to pursue collection of his costs and attorney's fees from the SEC.

    3.   <u>Orange Co. Litigation</u>

In 1987 and 1988, Mr. Davis was involved in litigation (Orange Co. litigation) with Stoneridge Resources, Inc. (Stoneridge)--the successor to Orange Co.  Mr. Davis and the other directors of Orange Co. were ousted as the result of a hostile proxy fight.  The new management of Stoneridge alleged breach of fiduciary duty and breach of contract by the former officers/directors (including Mr. Davis) in connection with the proxy fight and the transition of management in the company.  Mr. Davis was represented in the Orange Co. litigation regarding these matters by the firm of Squire, Sanders & Dempsey.

Mr. Davis counterclaimed alleging (1) damages from breach of certain contract rights and (2) unjust enrichment relating to the conditions and benefits of his employment with Orange Co.  These additional claims included claims for:  (1) Breach of options he had to purchase company airplanes, (2) severance pay, (3) continuation of health benefits, (4) vacation pay, and (5) accrued salary through his date of termination.  Mr. Davis retained additional counsel (Laura Byrne) to litigate these matters.

Mr. Davis also counterclaimed for indemnification for attorney's fees arising from the Orange Co. litigation.  Orange

Co.'s certificate of incorporation required indemnification of officers for expenses arising from acts performed in good faith and in a manner reasonably believed to be in the best interest of Orange Co. All of the SEC litigation expenses Mr. Davis deducted in 1987 and 1988, see infra, were included in the demand for indemnification in the Orange Co. litigation.

In 1992, the Orange Co. litigation was resolved. Stoneridge agreed to pay Mr. Davis $47,500.

In a letter dated May 18, 1995, Orange Co.'s directors' and officers' insurance company informed the IRS that it reimbursed Squire, Sanders & Dempsey for its representation of Mr. Davis and reimbursed Laura Byrne for her work as counsel for various officers and directors.

Legal Fees Charts

In 1987, Mr. Davis paid, incurred, and deducted on his Schedule C for 1987 the following legal fees:[4]

| Matter | Amount |
|---|---|
| Squirrel Bend litigation | $179,726 |
| SEC litigation | 51,285 |
| Orange Co. litigation | 36,163 |
| Tax matters | 3,493 |
| General business matters | 3,115 |
| Total | 273,782 |

---

[4] For convenience, all figures are rounded to the nearest dollar.

In 1988, Mr. Davis paid, incurred, and deducted on his Schedule C for 1988 the following legal fees:

| Matter | Incurred | Paid | Deducted |
|---|---|---|---|
| Squirrel Bend litigation | $252,972 | $133,082 | $252,972 |
| SEC litigation | 11,646 | 11,646 | 11,646 |
| Orange Co. litigation | 3,221 | 3,221 | 3,221 |
| Tax matters | 7,447 | 7,447 | 7,447 |
| General business matters | 4,225 | 4,225 | 4,225 |
| Hong Kong venture | 32,368 | 32,368 | 14,823 |
| Total | 311,879 | 191,989 | 294,334 |

## Consulting Fees

On his Schedules C for 1987 and 1988, Mr. Davis deducted as professional expenses payments he made to his son, Charles Davis, in the amounts of $16,600 and $36,000, respectively.

## Tax Returns

Mr. Davis timely filed Federal income tax returns, Forms 1040, for 1976, 1984, 1985, and 1987. On April 17, 1989, Mr. Davis filed Form 1045, Application for Tentative Refund, on which he carried back an NOL in the amount of $489,696, generated in 1988, to 1985 (1988 NOL).

## Preparation of Mr. Davis' Tax Returns

### 1. Mr. Fenn

Donald Fenn (Mr. Fenn) is a public accountant in Ohio. He received a bachelor of science from Bowling Green State University, where he majored in accounting. Since 1958, Mr. Fenn has been employed as a public accountant. He prepares Federal

and State income tax returns for individuals, corporations, and nonprofit organizations.

Mr. Fenn prepared the 1976 return including Schedule B, which disclosed Mr. Davis' charitable contributions. In preparing the 1976 return, he had full and unrestricted access to all of Mr. Davis' books and records. Jean Davis gave Mr. Fenn all of Mr. Davis' books and records necessary for the preparation of the 1976 return. Mr. Davis' books and records for 1976 were kept in good and regular order.

Mr. Fenn was provided a copy of the full and complete G & K appraisal of the Brown Road property. Mr. Fenn compiled and marked the attachments to the 1976 return concerning Mr. Davis' donation of the Brown Road property to the MBC. Mr. Fenn determined that it was not necessary to attach the entire G & K appraisal of the Brown Road property to the 1976 return and that just the G & K opinion letter was sufficient.

2. Mr. Stimmel

Richard Stimmel (Mr. Stimmel) is a certified public accountant. In 1967 or 1968, he received a business degree from Franklin University, where he majored in accounting. Until 1978, Mr. Stimmel was an accountant with Coopers & Lybrand. In 1979, he began working for Mr. Davis.

Mr. Stimmel prepared, or directed the preparation of, Mr. Davis' 1984, 1985, and 1987 Federal income tax returns. In

preparing Mr. Davis' tax returns for 1984, 1985, and 1987, Mr. Stimmel worked with Jean Davis and Ms. Blair. Mr. Stimmel had full and unrestricted access to all of Mr. Davis' books and records.

Mr. Stimmel determined the attachments to include in the 1985 return concerning Mr. Davis' charitable donations. He determined that it was not necessary to attach the entire 1985 appraisal to the 1985 return.

During the years in issue, Mr. Davis relied on professional accountants, Mr. Fenn and Mr. Stimmel, to prepare his Federal tax returns.

OPINION

I. Addition to Tax for Fraud

The addition to tax in the case of fraud is a civil sanction provided primarily as a safeguard for the protection of the revenue and to reimburse the Government for the heavy expense of investigation and the loss resulting from a taxpayer's fraud. See Helvering v. Mitchell, 303 U.S. 391, 401 (1938). Fraud is intentional wrongdoing on the part of the taxpayer with the specific purpose to evade a tax believed to be owing. See McGee v. Commissioner, 61 T.C. 249, 256 (1973), affd. 519 F.2d 1121 (5th Cir. 1975).

The Commissioner has the burden of proving fraud by clear and convincing evidence. See sec. 7454(a); Rule 142(b). To

satisfy the burden of proof, the Commissioner must show: (1) An underpayment exists; and (2) the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. See Parks v. Commissioner, 94 T.C. 654, 660-661 (1990). The Commissioner must meet this burden through affirmative evidence because fraud is never imputed or presumed. See Beaver v. Commissioner, 55 T.C. 85, 92 (1970).

A. Fraudulent Intent

The Commissioner must prove that a portion of the underpayment for each taxable year in issue was due to fraud. See Professional Servs. v. Commissioner, 79 T.C. 888, 930 (1982). The existence of fraud is a question of fact to be resolved from the entire record. See Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Because direct proof of a taxpayer's intent is rarely available, fraud may be proven by circumstantial evidence, and reasonable inferences may be drawn from the relevant facts. See Spies v. United States, 317 U.S. 492, 499 (1943); Stephenson v. Commissioner, 79 T.C. 995, 1006 (1982), affd. 748 F.2d 331 (6th Cir. 1984). A taxpayer's entire course of conduct can be indicative of fraud. See Stone v. Commissioner, 56 T.C. 213, 223-224 (1971); Otsuki v. Commissioner, 53 T.C. 96, 105-106 (1969). The sophistication, education, and intelligence of the

taxpayer are relevant to determining fraudulent intent.  See Niedringhaus v. Commissioner, 99 T.C. 202, 211 (1992); Stephenson v. Commissioner, supra at 1006; Iley v. Commissioner, 19 T.C. 631, 635 (1952).

Over the years, courts have developed a nonexclusive list of factors that demonstrate fraudulent intent.  These badges of fraud include:  (1) Understating income, (2) maintaining inadequate records, (3) implausible or inconsistent explanations of behavior, (4) concealment of income or assets, (5) failing to cooperate with tax authorities, (6) engaging in illegal activities, (7) an intent to mislead which may be inferred from a pattern of conduct, (8) lack of credibility of the taxpayer's testimony, (9) filing false documents, (10) failing to file tax returns, and (11) dealing in cash.  See Spies v. United States, supra at 499; Douge v. Commissioner, 899 F.2d 164, 168 (2d Cir. 1990); Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), affg. T.C. Memo. 1984-601; Recklitis v. Commissioner, 91 T.C. 874, 910 (1988).  Although no single factor is necessarily sufficient to establish fraud, the combination of a number of factors constitutes persuasive evidence.  See Solomon v. Commissioner, 732 F.2d 1459, 1461 (6th Cir. 1984), affg. per curiam T.C. Memo. 1982-603.  We note that some conduct and evidence can be classified under more than one factor.

B.    The Allegedly Fraudulent Items

Respondent claims that the following five items were fraudulent:

(1) Mr. Davis' charitable contribution deduction for the donation of the Brown Road property to the MBC in 1976;

(2) Mr. Davis' gift of Strata stock to Mr. Walker in 1984;

(3) Mr. Davis' gift of Strata stock to Dr. Ottelin in 1984;

(4) Mr. Davis' charitable contribution deduction for the donation of the 220 acres to Children's Hospital in 1985; and

(5) Mr. Davis' charitable contribution deduction for the donation of Strata stock to ODC in 1985.

C.    General Real Estate Matters

Respondent argues that Mr. Davis' donations of the Brown Road property and the 220 acres were part of a pattern by Mr. Davis of donating real estate to charities, inflating the values of the properties, and reporting the inflated values as charitable contribution deductions on his tax returns. Respondent alleges that Mr. Davis was able to inflate the values of the properties he donated to charities by (1) hiring a pliable and/or accommodating appraiser who he manipulated and (2) telling the appraiser, in advance, the conclusions that the appraiser should reach regarding the value of the property in question. Respondent further contends that (1) Mr. Garrison was a discredited appraiser and an old associate of Mr. Davis, (2) Mr.

Garrison and Mr. Davis had had a collusive relationship since the 1960's, (3) Mr. Davis controlled Mr. Garrison, and (4) Mr. Garrison lied to respondent's agents and at the trial of this case. Respondent also points to testimony in the record that Mr. Garrison had a reputation for appraisals on the high side.

1. <u>Mr. Garrison</u>

On the basis of the record and our opportunity to observe Mr. Garrison at trial, we found him credible. Mr. Garrison was a confident World War II veteran, and no one told him what to do or what to think.

Mr. Garrison was not financially dependent on Mr. Davis. Mr. Davis did not suggest values for properties he needed appraised. Respondent has failed to establish a conspiracy or any collusive relationship between Mr. Garrison and Mr. Davis.

Assuming arguendo that his appraisals were on the high side, Mr. Garrison believed his opinions were correct on the basis of the property's highest and best use. Mr. Davis believed that Mr. Garrison was a qualified and experienced appraiser and had no reason to doubt the values determined by Mr. Garrison. We fail to see how Mr. Garrison's alleged reputation establishes fraud on the part of Mr. Davis.

2. <u>Valuation</u>

Respondent, on brief, repeatedly states that "this is not a valuation case". We agree. The parties, however, devote much of

their briefs to the issue of the correct fair market value of the Brown Road property, the 220 acres, and other real properties not in issue.

Determining fair market value is an exercise in judgment on the part of the trier of fact.  See Colonial Fabrics, Inc. v. Commissioner, 202 F.2d 105, 107 (2d Cir. 1953).  Rarely would a good faith disagreement by the parties over fair market value establish fraudulent intent.

Seven experts testified at trial regarding the valuation of the 220 acres and the Brown Road property.  Ken Wilson and Ray Jackson, two of the experts, testified that appraisers could disagree and reach different conclusions.

Even if Mr. Garrison had negligently or fraudulently overvalued the properties he appraised, the record in this case does not demonstrate that Mr. Davis was aware of such negligent or fraudulent behavior on the part of Mr. Garrison.

### 3.   Conclusion

We conclude that Mr. Davis' use of Mr. Garrison as an appraiser and his reliance on Mr. Garrison's appraisals do not establish that Mr. Davis had the requisite fraudulent intent.

### D.   Brown Road Property

Respondent also argues that the donation of the Brown Road property was a barter transaction in which Mr. Davis had an understanding with the MBC, before he made the donation, that his

nieces and nephews would be able to attend the MBC's school tuition free. Furthermore, respondent contends that any testimony to the contrary by Mr. Davis, Mr. Eddy, and Pastor Brock is not credible. We disagree.

We found as a fact that the tuition waiver was Pastor Brock's idea. Mr. Davis did not make the tuition waiver a condition to the donation of the Brown Road property to the MBC. Mr. Davis never asked for a tuition waiver or implied that one should be given to his relatives. This is corroborated by the testimony of Pastor Brock, Mr. Eddy, and Mr. Davis, and we find them to be credible witnesses. We conclude that the gift of the Brown Road property to the MBC was not part of a barter transaction.

E. 220 Acres

To establish fraud, respondent also argues that Mr. Garrison created two false comparable sales and used them in the 1985 appraisal.

Two of the three comparable sales used in the 1985 appraisal never occurred. However, contrary to respondent's assertion, Mr. Garrison's use of the nonexistent sales was an innocent (or negligent) mistake, and Mr. Garrison first learned of the mistake many years after he prepared the 1985 appraisal. Neither Mr. Davis nor his employees provided these comparable sales to Mr. Garrison. Furthermore, Mr. Davis had no knowledge of the

nonexistent comparable sales until many years after Mr. Garrison prepared the 1985 appraisal and Mr. Davis deducted the donation. We conclude that Mr. Garrison's use of the nonexistent comparable sales does not establish fraud on the part of Mr. Davis.

Respondent also implies that Mr. Davis improperly "bought" Dr. Sotos' testimony in the Squirrel Bend litigation via the donation of the 220 acres to Children's Hospital.

In the Squirrel Bend litigation, Dr. Sotos testified to the grand jury and at the trial; however, Mr. Davis agreed to make the donation to Children's Hospital long before he was indicted in, or Dr. Sotos became aware of, the Squirrel Bend litigation. Furthermore, Dr. Sotos credibly testified the his integrity was not for sale.

We conclude that Mr. Davis' donation of the 220 acres to Children's Hospital was for charitable purposes and was not an attempt to influence Dr. Sotos' testimony in the Squirrel Bend litigation.

Respondent also asserts that the 1985 return was fraudulent because on Form 8283, filed as part of the 1985 return, the basis of the 220 acres was left blank.

Mr. Stimmel testified that not completing the entry on Form 8283 under donor's cost or adjusted basis was an oversight and that any blanks were his actions. See also infra (regarding Mr. Davis' reliance on return preparers). He further testified that

the records that reflected the donor's cost or adjusted basis were available to him. We find this testimony to be credible and conclude his minor oversight does not establish fraud on the part of Mr. Davis.

F.  Dr. Ottelin

Respondent contends that Mr. Davis' transfer of Strata stock to Dr. Ottelin was part of a barter transaction (i.e., Dr. Ottelin adjusted the dentures of Mr. Davis' mother in exchange for shares of Strata stock) and was not a gift, and any testimony by Dr. Ottelin or Mr. Davis to the contrary is not credible. We disagree.

Dr. Ottelin credibly testified that the adjustment he performed to the dentures of Mr. Davis' mother was a minor adjustment, and it was his normal practice not to bill for such services--they were gestures of goodwill. Furthermore, the gift of stock Mr. Davis made to Dr. Ottelin was worth at least hundreds, if not thousands, of dollars--an amount extremely disproportionate in comparison to the services Dr. Ottelin performed for Mr. Davis' mother. We conclude that the gift of Strata stock to Dr. Ottelin was not part of a barter transaction.

G.  Mr. Walker

Respondent contends that Mr. Davis sold Mr. Walker 100,000 shares of Strata stock. Respondent relies on a stock ledger

which respondent contends shows that the transaction was a sale. We disagree.

Ms. Blair maintained this ledger. The ledger contained a page captioned "S. Robert Davis - Strata". Ms. Blair testified that the purpose of this page was to keep track of how much Strata stock Mr. Davis owned. She further testified that she made the entries in the ledger referencing the transfer of 100,000 shares of Strata stock to Mr. Walker and that the transfer was not a sale of stock. Ms. Blair was credible, and her testimony corroborates Mr. Davis' testimony.

Furthermore, Mr. Davis testified that he was always promoting companies and that he made a practice of giving stock to people or investors in order to encourage them to send other investors to him or to keep them as investors. Mr. Walker was an important investor and a source of investors, and we believe that Mr. Davis made the gift to Mr. Walker in order to keep Mr. Walker as a potential future investor and source of potential future investors. Additionally, there is no evidence that petitioner received any money from Mr. Walker for the Strata stock.

H. ODC

Respondent claims that petitioner fraudulently overstated the value of the Strata stock he donated to ODC. Respondent argues that the stock was unregistered, and petitioner's claimed deduction was based on the registered, traded, asked price.

The 1985 return fully disclosed on Form 8283 the contribution of the Strata stock to ODC and the method used to determine the stock's fair market value. Furthermore, Mr. Davis relied on Mr. Stimmel to prepare the 1985 return and the Form 8283 regarding the donation of Strata stock to ODC. See infra.

I.    Reliance on Return Preparers

Respondent argues that petitioner knew about the erroneous and fraudulent nature of the information provided to his return preparers, and the return preparers were not in a position to discover any errors or fraud. Petitioner argues that his reliance on his employees and return preparers negates any fraudulent intent on his part. We agree with petitioner.

Petitioner's reliance upon third parties to keep his books and records and to prepare his returns indicates the absence of fraudulent intent. See Hill v. Commissioner, T.C. Memo. 1982-143; see also Marinzulich v. Commissioner, 31 T.C. 487, 490 (1958). Petitioner, in good faith, relied on members of his staff to turn over all of his books and records and otherwise make a full and complete disclosure to his third party return preparers. See Merritt v. Commissioner, 301 F.2d 484, 487 (5th Cir. 1962), affg. T.C. Memo. 1959-172.

Mr. Davis was a busy man who relied on his employees and professionals. Jean Davis credibly testified that all

information was provided to Mr. Fenn and Mr. Stimmel and nothing was concealed from them.

Respondent's argument that the return preparers were not in a position to uncover Mr. Davis' influence over the appraisers is without merit. Mr. Davis did not control, or conspire with, the appraisers hired to value the Brown Road property or the 220 acres. On the basis of the entire record, we conclude that Mr. Davis (via his employees) provided complete information to his return preparers, and his reliance on them was reasonable. This indicates the absence of fraudulent intent.[5]

J.    Respondent's Remaining Arguments

Respondent also attempts to establish fraudulent intent by pointing to the fact that IRS records reflect that Mr. Davis has not filed any gift tax returns for the years 1970 through 1993 and that Mr. Davis was uncooperative.

While the failure to file gift tax returns for the gifts to Mr. Walker and Dr. Ottelin might be troubling in a vacuum, we previously found that Mr. Davis relied on professional

---

[5]    Respondent also argues that Mr. Stimmel did not prepare Mr. Davis' tax returns. This argument is without merit. We found as a fact that Mr. Stimmel prepared Mr. Davis' tax returns for 1984, 1985, and 1987. Furthermore, in respondent's proposed finding of fact No. 307, respondent requested that the Court find "Richard Stimmel prepared petitioner's income tax returns during the relevant time period" as a fact.

accountants, Mr. Fenn and Mr. Stimmel, to prepare his tax returns.

We also do not believe that Mr. Davis' alleged "failure to cooperate" is the kind of uncooperativeness envisioned as a badge of fraud. One example of uncooperativeness alleged by respondent relates to pretrial motion practice and discovery requests. In this case, we do not believe that asserting privilege, having to be compelled to comply with discovery requests, and hiring numerous counsel to represent oneself are badges of fraud.

Furthermore, we do not find Mr. Davis's lack of memory about certain events to be uncooperative. The transactions in issue took place between 15 and 25 years ago, and many witnesses had difficulty remembering events from so long ago. In the instant case, a lack of memory about the distant past is understandable.

K.   Conclusion

After reviewing all of the facts and circumstances, we conclude that respondent has failed to prove clearly and convincingly that for 1976, 1984, or 1985 Mr. Davis intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. Accordingly, we do not sustain the additions to tax for fraud for these years.

II.  Period of Limitations

Respondent concedes that 1976 and 1984 are closed if the Court determines that petitioner did not file fraudulent tax returns for those years.  We have so found, and we agree with respondent.

The parties agree that pursuant to section 6501(h) the period of limitations on assessment for 1985 remains open for the deficiency attributable to the carryback of the 1988 NOL. Respondent, however, argues that 1985 is open not only for the deficiency attributable to the 1988 NOL carryback, but for any deficiency for 1985 up to the amount of the NOL carryback.  We are unable to agree with respondent's interpretation of this provision.

Section 6501(h) provides an extended period for assessment in the case of a deficiency attributable to an NOL carryback. Such a deficiency may be assessed at any time before the expiration of the period within which a deficiency for the year generating the NOL carryback may be assessed.  See sec. 6501(h).

The extended period for the assessment of deficiencies under section 6501(h) applies only to deficiencies attributable to NOL carrybacks.  See Bouchey v. Commissioner, 19 T.C. 1078, 1081 (1953); Leuthesser v. Commissioner, 18 T.C. 1112, 1125 (1952). Thus, deficiencies for 1985, the NOL carryback year, that are attributable to other items (i.e., non-NOL carryback items) are

barred by the 3-year period of limitations provided by section 6501(a).

III.  <u>1987 Deficiency and 1985 Deficiency Attributable</u>
      <u>to the 1988 NOL Carryback</u>

The deficiency for 1985 attributable to the 1988 NOL carryback consists of, in part, "consulting fees" paid to Charles Davis and legal expenses for tax matters, the Squirrel Bend litigation, the SEC litigation, the Orange Co. litigation, and general business matters.

The deficiency for 1987 consists of "consulting fees" paid to Charles Davis, a $24,000 travel expense, and legal expenses for tax matters, the Squirrel Bend litigation, the SEC litigation, the Orange Co. litigation, the Hong Kong venture, and general business matters.

Petitioner presented no evidence at trial regarding the travel expense, and petitioner did not address this issue, or the consulting fees paid to his son, on brief.  Therefore, we find that petitioner abandoned these issues.  See <u>Petzoldt v. Commissioner</u>, 92 T.C. 661, 683 (1989).

A.  <u>Deductibility of Legal Expenses</u>

Deductions are a matter of legislative grace, and petitioner bears the burden of proving that he is entitled to the deductions claimed.  See Rule 142(a); <u>INDOPCO, Inc. v. Commissioner</u>, 503 U.S. 79, 84 (1992).  Section 162 allows a deduction for ordinary

and necessary expenses paid or incurred in carrying on a trade or business.  Section 212 allows an individual to deduct all of the ordinary and necessary expenses paid or incurred in:  (1) Producing income, (2) managing, conserving, or maintaining property held for the production of income, or (3) determining, collecting, or refunding a tax.  Personal expenses are not deductible.  See sec. 262.

Whether an ordinary and necessary litigation expense is deductible under section 162(a) or section 212 depends on the origin and character of the claim for which the expense was incurred and whether the claim bears a sufficient nexus to the taxpayer's business or income-producing activities.  See Woodward v. Commissioner, 397 U.S. 572 (1970); United States v. Gilmore, 372 U.S. 39, 44-45 (1963); see also Peckham v. Commissioner, 327 F.2d 855, 856 (4th Cir. 1964), affg. 40 T.C. 315 (1963); Guill v. Commissioner, 112 T.C. 325 (1999).  Ordinary and necessary litigation costs are generally deductible under section 162(a) when the matter giving rise to the costs arises from, or is proximately related to, a business activity.  See Woodward v. Commissioner, supra; Kornhauser v. United States, 276 U.S. 145, 153 (1928).  Litigation costs must be "attributable to a trade or business carried on by the taxpayer" in order to be deductible as a business expense.  Sec. 62(a)(1); see Guill v. Commissioner, supra.

The ascertainment of a claim's origin and character is a factual determination that must be made on the basis of the facts and circumstances of the litigation. See United States v. Gilmore, supra at 47-49. The most important factor to consider is the circumstances out of which the litigation arose. See Guill v. Commissioner, supra; Boagni v. Commissioner, 59 T.C. 708 (1973). In passing on this factor, the fact finder must take into account, among other things, the allegations set forth in the complaint, the issues which arise from the pleadings, the litigation's background, nature, and purpose, and the facts surrounding the controversy. See Guill v. Commissioner, supra; Boagni v. Commissioner, supra at 713.

B.   Squirrel Bend Litigation

Petitioner argues that (1) the origin of the claim in the Squirrel Bend litigation was Mr. Davis' sale of Big Bite stock to Mr. Hyrne, and (2) this was directly related to Mr. Davis' trade or business of promoting Big Bite. Respondent counters that the origin of the claim was the construction of the waterline at Squirrel Bend. We agree with respondent.

The Squirrel Bend litigation was a mail fraud case. Mr. Davis used the U.S. mail to transmit documents associated with the construction of the waterline at Squirrel Bend. The indictment alleged that he improperly inflated the cost of the waterline. Mr. Davis was not charged with bribing Mr. Hyrne.

Although Mr. Hyrne allegedly allowed Mr. Davis to inflate the cost of the waterline because Mr. Hyrne acquired the opportunity to purchase Big Bite stock, the sale of the stock itself was not alleged to be improper; rather, the cost inflation was allegedly improper. We conclude, therefore, that the origin of the claim was the construction of the waterline at Squirrel Bend.

The parties stipulated that Mr. Davis' activity at Squirrel Bend was not a trade or business, and petitioner presented no evidence suggesting that he managed, conserved, or maintained his personal residence at Squirrel Bend for the production of income. Therefore, we conclude that petitioner is not entitled to deduct the legal fees associated with the Squirrel Bend litigation in any amount greater than that which was allowed by respondent in the notices of deficiency.

C.   SEC and Orange Co. Litigation Expenses

Petitioner argues that the SEC and Orange Co. litigation expenses were related to his "business of promoting" or his business of being an employee of Orange Co. (as an officer and director). Respondent contends that the SEC litigation was not related to a business activity. In the alternative, respondent argues that if petitioner's actions were in the course of petitioner's trade or business of being an employee of Orange Co., he was entitled to reimbursement of the SEC and Orange Co.

litigation expenses from Orange Co.  Therefore, respondent contends that petitioner is not entitled to deduct the SEC and Orange Co. litigation expenses.

Assuming arguendo that Mr. Davis was in the "business of promoting"[6]--which he alleges entailed the starting and promoting of businesses--the SEC and Orange Co. litigation did not arise from, were not proximately related to, and did not bear a nexus to a "business of promoting".  The SEC litigation arose out of the SEC's investigation of an unusual amount of trading of Orange Co. stock in August of 1984 by Mr. Binion and Mr. Davis' sons. The complaint the SEC filed alleged that certain trading by Mr. Davis' sons was based on material, nonpublic information provided to them by their father.  The Orange Co. litigation arose out of a hostile proxy fight, an alleged breach of fiduciary duty and breach of contract by Orange Co.'s former officers and directors, and the ouster of the directors of Orange Co.  The Orange Co. litigation also involved Mr. Davis' additional breach of contract and unjust enrichment claims.

Assuming arguendo that the aforementioned claims in the SEC and Orange Co. litigation were related to his position as an employee of Orange Co., the performance of services as an

---

[6] We make no finding regarding whether Mr. Davis was in the "business of promoting".

employee constitutes a trade or business. See O'Malley v. Commissioner, 91 T.C. 352, 363-364 (1988).

When an employee, however, has a right to reimbursement for expenditures related to his status as an employee but fails to claim such reimbursement, the expenses are not deductible because they are not "necessary" within the meaning of section 162; i.e., it is not necessary for an employee to remain unreimbursed for expenses to the extent he could have been reimbursed. See Orvis v. Commissioner, 788 F.2d 1406, 1408 (9th Cir. 1986), affg. T.C. Memo. 1984-533; Lucas v. Commissioner, 79 T.C. 1, 7 (1982); Kennelly v. Commissioner, 56 T.C. 936, 943 (1971), affd. without published opinion 456 F.2d 1335 (2d Cir. 1972). The employee has the burden of establishing that the employer would not reimburse the expense had the employee requested reimbursement. See Podems v. Commissioner, 24 T.C. 21, 23 (1955). Moreover, the prohibition of deductions for reimbursable expenses is a "bright line rule" and applies even when the employee is unaware that the expenses are reimbursable. See Orvis v. Commissioner, supra at 1408.

Orange Co.'s certificate of incorporation required indemnification of officers for expenses arising from acts performed in good faith and in a manner reasonably believed to be in the best interest of Orange Co. All of the SEC and Orange Co. litigation expenses Mr. Davis deducted in 1987 and 1988 were

included in the demand for indemnification in the Orange Co. litigation. Furthermore, Orange Co.'s directors' and officers' insurance company paid these attorney's fees, and petitioner has failed to produce any credible evidence that he was not reimbursed in full or that during the years in issue the prospect of being reimbursed was insubstantial.[7] Therefore, we conclude that petitioner was not entitled to deduct the SEC or Orange Co. litigation expenses for 1987 or 1988.

D. <u>Hong Kong Legal Fees, General Business Matters, and Tax Matters</u>

On brief, petitioner merely conclusively asserts that the Hong Kong legal fees were related to, and a continuation of, his "business of promoting" and that he incurred the legal fees for tax matters and general business matters in connection with a trade or business.

Petitioner neglected to cite any facts and failed to present any evidence that would support these assertions. We conclude that petitioner has failed to meet his burden of proof with regard to these expenses. See Rule 142(a).

---

[7] Petitioner contends that he was not reimbursed for the work Laura Byrne, who represented petitioner in part of the Orange Co. litigation, did for him. On the basis of the record, however, petitioner has failed to prove that he was not reimbursed or that he did not have a right to be reimbursed for these expenses.

To reflect the foregoing,

<u>Decision will be entered for respondent in docket No. 4449-92</u>.

<u>Decision will be entered under Rule 155 in docket No. 5744-92</u>.

<u>Decision will be entered for petitioner in docket No. 25088-96</u>.